UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENNIS RAY GOVER,

       Plaintiff                                Case No. 20-12700

v.                                               HON. MARK A. GOLDSMITH

CITY OF DETROIT, et al.,

       Defendants.
_____/

**OPINION & ORDER
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 21)**

This matter is before the Court on Defendant the City of Detroit and Defendant Khary Mason's motion for summary judgment (Dkt. 21). For the reasons stated below, Court grants Defendants' motion as to the federal claims against them and dismisses without prejudice Plaintiff Dennis Ray Gover's state-law claims pursuant to 28 U.S.C. § 1367(c)(3).[1]

**I. BACKGROUND**

Gover brings this 42 U.S.C. § 1983 action against the City and Mason, who is employed by the City as a detective, in Mason's individual capacity.[2] Compl. (Dkt. 1). This action stems from a search warrant that was executed on Gover to perform a blood draw.

In January 2018, Gover's son was kidnapped, and in February 2018, Gover learned that police officers had discovered his son's lifeless body in the City of Detroit. Search Warrant at 5 (Dkt. 21-1); Gover Dep. at 23 (Dkt. 21-2). Later in February 2018, Gover informed Mason and Officer Theopolis Williams that, after his son's death, a man known to him as "Stress" gave him

---

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the motion, the briefing includes Plaintiff's response (Dkt. 25) and Defendants' reply (Dkt. 27).

[2] Gover also named Detroit Receiving Hospital as a defendant, but upon stipulation of the parties, the Court dismissed Detroit Receiving Hospital from the case. 2/22/21 Order (Dkt. 14).

$99,990 in cash, a watch, and a ring, all of which had belonged to his son. Gover Dep. at 25, 34–36; Search Warrant at 6. Gover turned over the watch and ring to the police. Gover Dep. at 36.

On October 3, 2018, Gover met with Mason to discuss the progress of the investigation into his son's death. Id. at 37. Gover claims that Mason, Officer Moises Jimenez, and another unidentified police officer each requested that Gover provide a DNA sample, but Gover refused to do so. Id. at 38–39. The next day, Gover, who served as a volunteer chaplain for the Detroit Police Department (DPD), received a phone call from Lennell Caldwell, the Assistant Chief Chaplain of DPD. Id. at 15, 54–55. Caldwell instructed Gover to go to DPD headquarters the following day to surrender his DPD chaplain badge and uniform. Id. at 54.

When Gover arrived at DPD headquarters on October 5, 2018, Jimenez presented him with a search warrant that authorized the police to search Gover and seize and return a buccal swab/blood draw from him. Id. at 15–16. Mason prepared the affidavit in support of the warrant, and a judge in Michigan's Wayne County Circuit Court issued the warrant. Search Warrant. According to Mason, the police sought to obtain Gover's DNA so that they could "eliminate" it from the watch and ring and thereby separate the DNA of those who could have legally possessed the jewelry, such as Gover, from the DNA of those who may be able to lead police to the person who killed Gover's son. Mason Dep. at 15 (Dkt. 21-3); see also Search Warrant at 6 (averring that Mason asked Gover to consent to giving a DNA sample "to eliminate him from the contributors on the jewelry").

Gover did not comply with the search warrant. Gover Dep. at 13–14. Jimenez handcuffed Gover, and two other police officers transported him to the Mound Road Detention Facility. Id. at 13–14, 16. While Gover was at the facility, Jimenez and the officer who had requested a

DNA sample from Gover on October 3 asked him if he wanted to submit a DNA sample. Id. at 14, 17. Gover stated that he would do so if he could contact his attorney. Id. at 14. These two officers eventually transported Gover in handcuffs to Detroit Receiving Hospital, where hospital staff drew his blood. Id. at 14, 17. Gover was then transported back to the Mound Road Detention Facility and released later that night. Id. at 14.

Gover asserts two federal claims, which include a Fourth Amendment unlawful search and seizure claim and a First Amendment retaliation claim. He also asserts three state-law claims, which include violation of the Michigan constitution's protection against unlawful search and seizure, unlawful imprisonment, and battery.

## II. ANALYSIS[3]

Defendants argue that qualified immunity protects Mason from liability for the First and Fourth Amendment claims asserted against him. Mot. at 11–12. They also contend that the City is entitled to summary judgment on the First and Fourth Amendment claims asserted against it because there is no municipal liability. Id. at 3–6. The Court addresses each argument in turn. It then explains that, because Defendants are entitled to summary judgment on the federal claims, the Court will dismiss the state-law claims.

A. Qualified Immunity

---

[3] **In assessing whether Defendants are entitled to summary judgment, the Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).**

To state a claim under § 1983, a plaintiff must set forth facts that, when construed in his or her favor, establish (i) the deprivation of a right secured by the Constitution and (ii) that the deprivation was caused by a person acting under color of state law. Sigley v. City of Parma Heights, 437 F.3d 527, 533 (6th Cir. 2006).

Defendants argue that Mason is entitled to qualified immunity because there was no constitutional violation. Mot. at 11–12. Qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). After a defending officer initially raises qualified immunity, the plaintiff bears the burden of showing that the officer is not entitled to qualified immunity. Burgess v. Fischer, 735 F.3d 462, 472 (6th Cir. 2013). In addressing a government official's qualified immunity claim, a court first must decide whether the facts a plaintiff has alleged or shown make out a violation of a constitutional right. Pearson v. Callahan, 555 U.S. 223, 231–232, (2009). A court then must consider whether the right at issue was clearly established at the time of defendant's alleged misconduct. Id. It may assess these two factors in the most efficient order and manner. Id. The Court finds that Gover has not established a Fourth or First Amendment violation, and, therefore, Mason is entitled to summary judgment on the federal claims asserted against him.

   **1. Fourth Amendment Claim**

Gover alleges that Mason's affidavit was insufficient to provide probable cause for the warrant, and, therefore, the seizure of his blood evidence violated the Fourth Amendment. Resp. at 10–12.

Under the Fourth Amendment, a search warrant may be issued only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the . . . things to be seized." U.S. Const. amend. IV. "Probable cause exists if the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched." Peffer v. Stephens, 880 F.3d 256, 263 (6th Cir. 2018) (punctuation modified).

In the Fourth Amendment search and seizure context, "[p]olice officers are entitled to rely on a judicially secured warrant for immunity from a § 1983 action for illegal search and seizure unless the warrant is so lacking in indicia of probable cause, that official belief in the existence of probable cause is unreasonable." Yancey v. Carroll Cnty., 876 F.2d 1238, 1243 (6th Cir. 1989). However, "an officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant." Id. A plaintiff, thus, may challenge an officer's qualified immunity defense in a civil rights case by showing that "(1) the officer's warrant affidavit contained a false statement or omission that was made either deliberately or with reckless disregard for the truth; and (2) the false statement or omission was material to the finding of probable cause." Tlapanco v. Elges, 969 F.3d 683, 649 (6th Cir. 2020).

Gover's blood draw occurred pursuant to a judicially issued warrant. The evidence does not suggest that the warrant was so lacking in indicia of probable cause that Mason's belief in its validity at the time it was issued was unreasonable. See United States v. Gilbert, 952 F.3d 759, 763 (6th Cir. 2020) (explaining that an affidavit that is so lacking in indicia of probable cause that no reasonable officer would rely on the warrant is a bare bones affidavit, as distinguished from an affidavit that merely lacks probable cause); United States v. Frazier, 423 F.3d 526, 536

5

(6th Cir. 2005) (stating that the question of whether an officer's reliance on the warrant was objectively reasonable depends on "whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization," which requires a "less demanding showing than the 'substantial basis' threshold required to prove the existence of probable cause in the first place") (punctuation modified).

The warrant described the circumstances surrounding the alleged crimes of the kidnapping and murder of Gover's son, in addition to alleged involvement in drug crimes by Gover's son and a man known as Stress. It stated that the police executed a search warrant at an apartment used by Gover's son and that inside the apartment was a safe that had been broken into and was empty. It also stated that, after his son's body was discovered, Gover informed police that he received from Stress cash, a watch, and a ring that belonged to his son. The warrant set forth that Gover's girlfriend had communicated with Stress before Gover's son died and that Gover's DNA sample was needed to eliminate his DNA from the contributors on the jewelry. The parties agree that Gover was in possession of his son's watch and ring, that Gover's DNA was on the watch and ring, and that the police did not know which DNA evidence on the watch and ring belonged to Gover.

In support of his argument that the affidavit was insufficient to support a probable cause determination, Gover contends that the elimination of his DNA evidence from the jewelry would do little to further the investigation of his son's death. Mot. at 11–12. But any ultimate impact of the elimination of his DNA does not establish that the warrant was so lacking in indicia of probable cause that belief in the existence of probable cause was unreasonable. In addition, Gover argues that he was not a suspect to the commission of a crime. Id. at 12. But the warrant that authorized the blood draw was not an arrest warrant—in which Gover's commission of an

6

offense would be relevant. Smith v. City of Wyoming, 821 F.3d 697, 715 (6th Cir. 2016) (explaining that probable cause for an arrest exists "where the facts and circumstances within the officer's knowledge [ ] are sufficient to warrant a prudent person . . . in believing . . . that the suspect committed, is committing, or is about to commit an offense") (punctuation modified). Rather, the search warrant authorized Gover's blood draw. Probable cause for a search exists if "there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." United States v. Perry, 864 F.3d 412, 415 (6th Cir. 2017). Here, the crime was the suspected kidnapping and murder of Gover's son; determining whether Gover's DNA was present on the jewelry would assist law enforcement in determining Gover's contact or lack of contact with items connected to the crime.

Gover does not allege that Mason's affidavit contained a false statement or omission. Rather, he contends that Mason is not entitled to qualified immunity because he knew or should have known that a conclusory allegation about eliminating Gover's DNA from the jewelry was insufficient to establish probable cause. Resp. at 13. But this does not successfully challenge Mason's qualified immunity defense. See Tlapanco, 969 F.3d at 650. And, in assessing whether an affidavit supports a judge's probable-cause determination, courts review the affidavit based on the totality of the circumstances, not on a single statement. United States v. Greene, 250 F.3d 471, 479 (6th Cir. 2001); United States v. Allen, 211 F.3d 970 (stating that an affidavit "is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added" and that courts assess the totality of the circumstances to determine whether an affidavit is bare bones).

Moreover, no evidence indicates that there is a genuine factual dispute as to whether Mason's affidavit contained a deliberate falsehood or omission or showed reckless disregard for

the truth. Therefore, Mason is entitled to qualified immunity on the Fourth Amendment claim asserted against him. See Tlapanco, 969 F.3d at 650 (explaining that, at the summary-judgment phase, a plaintiff must make a "substantial showing of a genuine dispute of material fact regarding whether [the officer's] affidavit contained a deliberate falsehood or showed reckless disregard for the truth") (punctuation modified); Butler v. City of Detroit, 936 F.3d 410, 419 (6th Cir. 2019) (explaining that a plaintiff may make such a substantial showing by presenting proof that, "at the time the officer swore out the affidavit, she knew of or possessed information that contradicted the sworn assertions").

### 2. First Amendment Claim

Gover alleges that, in violation of the First Amendment, Defendants retaliated against him for his refusal to consent to a blood draw by unlawfully detaining him and unlawfully seizing blood evidence from him without his consent. Compl. ¶¶ 60–65. Defendants argue that there is no First Amendment violation because Mason was not involved in Gover's search, seizure, or arrest and because Gover's arrest was supported by probable cause. Mot. at 6–12.

As an initial matter, the Court notes that Gover did not respond to Defendants' argument that they are entitled to summary judgment on the First Amendment claim, and, therefore, he may be deemed to have abandoned or waived any challenge to it. See Brown v. VHS of Mich., Inc., 545 F. App'x 368, 372 (6th Cir. 2013) (holding that a party abandons a claim by not responding to an argument made in a motion for summary judgment); Davis v. Detroit Downtown Dev. Auth., No. 17-cv-11742, 2021 WL 4350533, at *4 n.4 (E.D. Mich. Sept. 24, 2021) (noting that, "[i]n a variety of contexts, courts have construed silence by a civil litigant in the face of an argument made in the opposing party's motion as an abandonment or waiver of any challenge to it"). Even

8

putting waiver and abandonment aside, Mason is entitled to summary judgment on the First Amendment claim asserted against him.

As discussed above, qualified immunity protects Mason from liability to the extent that Gover alleges that he was unlawfully searched or seized. In regard to Gover's claim that he was unlawfully detained, Mason was not involved in Gover's detention or subsequent arrest. A defendant may not be "held liable for the conduct of another" under § 1983. Apsey v. Chester Twp., 608 F. App'x 335, 339 (6th Cir. 2015). To establish liability and to overcome a qualified immunity defense, an individual must show that the alleged violation of his or her rights was "committed personally by" the defendant. Alexander v. Carter for Byrd, 733 F. App'x 256, 267 (6th Cir. 2018) (emphasis in original). Gover contends that Mason participated in the search and seizure because he submitted the affidavit in support of the warrant and directed officers in the execution of the warrant. Resp. at 13. But Mason's submission of the affidavit does not show involvement in Gover's subsequent detention or arrest.

There is also insufficient evidence to create a material factual dispute that Mason directed officers when they detained or arrested Gover. Gover stated that, on the day he was arrested and transported to the Mount Road Facility and later to Detroit Receiving Hospital, he did not see Mason, and he was not in Mason's presence. Gover Dep. at 21. He stated that he heard a phone call between the officers who transported him to Detroit Receiving Hospital and Mason. Id. But when he heard the phone call, he had already been detained and arrested. Gover has not even sufficiently alleged—let alone presented evidence to show—Mason's personal involvement in Gover's arrest and detention. Cf. Alexander, 733 F. App'x at 267 (rejecting plaintiff's argument that defendant officer and arresting officer reached an agreement to arrest plaintiff when plaintiff was already under arrest at the time the alleged agreement was made); Bennett v. Schroeder, 99

9

F. App'x 707, 713–714 (6th Cir. 2004) (finding that officer was entitled to summary judgment when plaintiff's interrogatory answers did not state that officer was the one who arrested him and when officer testified that he had no personal involvement in the plaintiff's arrest).

To the extent that Gover bases his First Amendment claim on his arrest, the undisputed evidence shows that probable cause existed for his arrest. The existence of probable cause generally defeats a retaliatory arrest claim, <u>Nieves v. Bartlett</u>, 139 S. Ct. 1715, 1726 (2019), and if officers have probable cause to arrest, they are entitled to qualified immunity, <u>Novak v. City of Parma</u>, 932 F.3d 421, 429 (6th Cir. 2019). An officer has probable cause "when, at the moment the officer seeks the arrest, the facts and circumstances within [the officer's] knowledge and of which [he or she] had reasonably trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [plaintiff] had committed or was committing an offense." <u>Wesley v. Campbell</u>, 779 F.3d 421, 429 (6th Cir. 2015) (punctuation modified); see also <u>Pyles v. Raisor</u>, 60 F.3d 1211, 1215 (6th Cir. 1995) ("In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible."). The arrest report shows that Gover was arrested for obstruction. Booking Documents at PageID.362 (Dkt. 25-2). Defendants argue that there was probable cause to arrest Gover for this offense. Mot. at 10–11. Michigan law states that "[a] person shall not attempt to intimidate, hinder, or obstruct a public officer or public employee or a peace officer in the discharge of his or her official duties by a use of unauthorized process." Mich. Comp. L. § 750.478a(1). "Obstruct" includes "the use or threatened use of physical interference or force or a knowing failure to comply with a lawful command." <u>Id.</u> § 750.479(8)(a). Gover's refusal to comply with the search warrant after being presented with it is sufficient to warrant the belief that he had committed or was committing obstruction.

10

Therefore, Mason is entitled to summary judgment on the First Amendment claim asserted against him.

**A.** Municipal Policy or Custom

Defendants argue that the City is entitled to summary judgment on the federal claims because Gover cannot establish a constitutional violation, and, even if he could, he cannot establish a policy or custom that was the moving force behind it. Mot. at 3–6.

Gover cannot base his claim against the City solely on Mason's conduct because respondeat superior is not available as a theory of recovery under § 1983. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." Id. Instead, under § 1983, municipal liability may attach only where "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" of which the plaintiff complains. Id. The United States Court of Appeals for the Sixth Circuit has explained that, to satisfy the requirements of Monell, a § 1983 plaintiff must "identify the policy, connect the policy to the [municipality] itself and show that the particular injury was incurred because of the execution of that policy." Garner v. Memphis Police Dep't, 8 F.3d 358, 364 (6th Cir. 1993) (punctuation modified). Thus, there must be a be "a direct causal link" between the policy and the alleged constitutional violation such that the municipality's "deliberate conduct" can be deemed the "moving force" behind the violation. Waters v. City of Morristown, 242 F.3d 353, 362 (6th Cir. 2001) (punctuation modified).

Policy is made when "a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict. Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986). Customs are "practices of state officials . . . so

11

permanent and well settled as to virtually constitute law." Id. (quoting Monell, 436 U.S. at 691). A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (i) the existence of an illegal official policy or legislative enactment; (ii) actions taken by an official with final decision-making authority; (iii) the existence of a policy of inadequate training or supervision; or (iv) the existence of a custom of tolerance or acquiescence of federal rights violations. Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005).

Even if Gover had established a constitutional violation, he has not identified an illegal policy or custom, connected that policy or custom to the City, or shown that the alleged injury occurred because of that policy or custom. Gover does not explicitly state in his response which of the above four avenues for showing a policy or custom he pursues. In his complaint, he alleges that the City hired or retained employees who abused their authority and who were unsupervised and inadequately trained. Compl. ¶¶ 14–16. He also alleges that the City failed to adopt policies or procedures, such as additional training and supervision, that would have prevented the violation of constitutional rights. Id. ¶ 17.

To the extent Gover relies on an inadequate training or supervision theory, inadequate training or supervision can be the basis for a § 1983 municipal liability claim when it "amounts to deliberate indifference to the rights of persons with whom the police come into contact." Roell v. Hamilton Cnty., Ohio/Hamilton Cnty. Bd. of Cnty. Comm'rs, 870 F.3d 471, 487 (6th Cir. 2017). "To succeed on a failure to train or supervise claim, the plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." Ellis v. Cleveland Mun. Sch. Dist., 455 F.3d 690, 700 (6th Cir. 2006). There are two situations in which inadequate training could be

found to be the result of deliberate indifference. Cherrington v. Skeeter, 344 F.3d 631, 646 (6th Cir. 2003). First, a plaintiff can demonstrate a factual dispute regarding deliberate indifference by showing that the municipality has failed to act "in response to repeated complaints of constitutional violations by its officers." Id. (punctuation modified). Under this approach, a plaintiff must show that the defendant was aware of "prior instances of unconstitutional conduct" such that it "was clearly on notice that the training in this particular area was deficient and likely to cause injury," and yet "ignored a history of abuse." Fisher v. Harden, 398 F.3d 837, 849 (6th Cir. 2005). Second, in a "narrow range of circumstances," a plaintiff can show that a municipality was deliberately indifferent by "fail[ing] to equip law enforcement officers with specific tools to handle recurring situations." Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 409 (1997).

Gover has not demonstrated a genuine dispute of material fact under either approach. Gover has not set forth any evidence that there were prior instances of unconstitutional conduct. He has not set forth any evidence that the policies in the areas of search, seizure, and arrest were inadequate for the tasks that the Department's officers were required to perform, and he does not contend that the need for training against the alleged misconduct was obvious such that a single incident demonstrates deliberate indifference. Mason testified that DPD's policy is to seek warrants when probable cause exists. Mason Dep. at 29. Gover does not offer evidence to rebut that statement.

To the extent that Gover tries to establish municipal liability based on "inaction theory," in which "a policy of tolerating federal rights violations is unwritten but nevertheless entrenched," he must show: (i) the existence of a clear and persistent pattern of illegal activity, (ii) the defendant's notice or constructive notice, (iii) the defendant's tacit approval of the

unconstitutional conduct, and (iv) that the custom was the "moving force" or direct causal link in the constitutional deprivation. Thomas, 398 F.3d at 429. Gover has not set forth any facts that there was a pattern of illegal activity.

In his response, Gover contends that the decisions to seek a warrant without probable cause and execute a warrant that lacked probable cause were not the actions of a single police officer, but rather the result of "coordinated actions of multiple police officers and [the DPD] Chaplain's Corps," at the direction of Mason and Liaison Officer Potts. Resp. at 9–10. But Gover's description of these "coordinated actions" simply consists of the steps that the officers took in seeking and executing the search warrant. See id. The fact that Mason sought a warrant and other police officers then executed it, including the arrest of Gover when he did not comply with the warrant, does not establish that a constitutional violation occurred because of a policy or custom.

In support of his claim that an unconstitutional policy or custom exists, Gover relies on Davis v. Wayne Cnty. Sheriff, 507 N.W.2d 751 (Mich. Ct. App. 1993). But he quotes Davis out of context. There, the Michigan Court of Appeals considered a defendant police officer's argument that, because he was acting outside the scope of the employment when he committed the alleged wrongdoing, he did not act under color of state law and could not be liable under § 1983. 507 N.W.2d at 579. The court explained that simply because the defendant was off duty when the alleged wrongdoing occurred—and therefore did not act under color of state law—did not mean that the defendant was absolved from § 1983 liability. Id. It reached this conclusion because the plaintiffs' claim against the defendant was based upon a county's formulation of policy regarding the operation of the department and supervision of officers—and such formulation of policy is done under color of state law. Id. Thus, when the court stated that

14

"[t]he defendant does not, and indeed cannot, argue that the formulation of policy within the department is done outside the color of state law"—which Gover quotes—it was referencing the fact that, for the purpose of addressing the issue of whether the defendant acted under color of state law, it assumed that the policies caused the violations at issue. Id. The court made this statement while emphasizing that the color of law inquiry and the policy or custom inquiry are distinct. Here, the issue is not whether Mason acted under color of law but whether there is a genuine factual dispute that the alleged constitutional violations occurred because of a policy or custom.

Moreover, Davis does not aid Gover on the issue of whether a policy or custom existed or the alleged constitutional violations occurred because of a policy or custom. The court found that the evidence presented—which included testimony about past instances of the defendant's misconduct, and, therefore, was more substantial than the evidence here—was insufficient to suggest that the county's failure to train or supervise caused the constitutional violations. Id. at 584.

Thus, even if Gover established a Fourth or First Amendment violation, there is not a genuine factual dispute that such a violation flowed from the execution of a municipal policy or custom. As a result, the City is entitled to summary judgment on the § 1983 claims asserted against it.

**B. State-Law Claims**

Because the Court grants Defendants' motion as to the federal claims, the Court will exercise its discretion to decline to exercise supplemental jurisdiction over the remaining state-law claims by dismissing these claims without prejudice. 28 U.S.C. § 1367(c)(3); United Mine Workers of

Am. v. Gibbs, 383 U.S. 715, 726–727 (1966) ("[I]f the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

### III. CONCLUSION

For the reasons stated above, the Court grants Defendants summary judgment on the federal claims against them and dismisses without prejudice Gover's state-law claims pursuant to § 1367(c)(3).

SO ORDERED.

Dated: July 8, 2022  　　　　　　　　　　s/Mark A. Goldsmith
　　　　Detroit, Michigan　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　United States District Judge